UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| Marlena Barton,<br>Plaintiff<br>v.<br>Sunbeam Products, Inc., et al,<br>Defendants | Case No. 2:25-cv-00156-CDS-MDC<br>**Order Denying Barton's Motion for Summary Judgment and Granting in Part Defendants' Motions for Summary Judgment**<br>[ECF Nos. 52, 53, 54, 55] |

Plaintiff Marlena Barton sued Sunbeam Products, Inc., Newell Brands Inc., and Newell Brands Distribution LLC (together, "Sunbeam"), and Walmart, Inc. for strict liability and negligence after she was burned using a Sunbeam heating pad. Compl., ECF No. 1 at 10–26. Pending before the court are three motions for summary judgment. ECF Nos. 52, 53, 55. On January 29, 2026, Barton filed a motion for partial summary judgment against Walmart, which included a request to exclude Walmart's experts. Pl.'s MSJ, ECF No. 52. This motion is fully briefed. Opp'ns, ECF Nos. 58, 59; Replies, ECF Nos. 68, 69. On January 29, 2026, Sunbeam filed a motion for summary judgment. Defs.' MSJ, ECF No. 53. Walmart joined that motion as to the parts discussing whether the subject heating pad contained a defect. Joinder, ECF No. 54. This motion is fully briefed. Opp'ns, ECF Nos. 60, 61; Replies, ECF Nos. 65, 70. On February 12, 2026, Walmart moved for summary judgment, including a request to exclude Barton's experts. Def.'s MSJ, ECF No. 55. This motion is also fully briefed. Opp'n, ECF No. 66; Reply, ECF No. 73. For the reasons set forth herein, I deny Barton's motion, including her request to exclude Walmart's experts; grant in part and deny in part Sunbeam's motion, to which Walmart joined in part; and grant in part and deny in part Walmart's motion, including granting Walmart's request to exclude Barton's expert witnesses.

# I. Background

## A. Overview[1]

On March 26, 2023, Barton was visiting her daughter in Las Vegas, Nevada. ECF No. 1 at 13; Barton's dep., Defs.' Ex. A, ECF No. 53-2 at 19, ll. 20–25; *id.* at 36, ll. 9–15. Because Barton was experiencing back pain, her daughter recommended that Barton use the daughter's heating pad. *Id.* at 22–23; Williams's dep., Defs.' Ex. B, ECF No. 53-3 at 12- 13. Thereafter, Barton laid on her daughter's bed, the daughter placed the heating pad on the top part of Barton's back, and Barton set the pad to its medium temperature setting. ECF No. 53-3 at 23–24. Neither Barton nor her daughter saw any warnings on the pad's electrical cord or in its box. ECF No. 53-2 at 26, ll. 14–16; *id.* at 61, ll. 2–18; *id.* at 66–67; ECF No. 53-3 at 15, ll. 19–23. Barton used the pad for about thirty minutes. ECF No. 53-2 at 27, 29. At first, she felt a "comfortable warm feeling." *Id.* at 28, l. 20. Eventually, she started to feel "a little heat on [her] side and then it was like a burning sensation." *Id* at 28, ll. 10–11. Barton checked herself and noticed her right breast was burned. *Id.*

On December 20, 2024, Barton brought suit against the defendants for strict liability and negligence. ECF No. 1 at 10–26. As part of her complaint, Barton sought punitive damages. *Id.* at 26. During litigation, Barton retained three experts: Dr. Steven Murray, an electrical engineer; Dr. Michel F. Brones, a burn surgeon; and William. F. Kitzes, a product safety manager. *See* Murray expert report, Pl.'s Ex. 4, ECF No. 52-7; Brones expert report, Pl.'s Ex. 5, ECF No. 52-8; Kitzes expert report, Pl.'s Ex. 9, ECF No. 52-12. All three experts opined that the subject heating pad was "unreasonably dangerous" because the temperatures it was designed and manufactured to reach were "excessive, unnecessary and provided no extra therapeutic benefit." ECF No. 55-12 at 8 (Brones); ECF No. 55-13 at 35 (Kitzes); ECF No. 55-14 at 6–7 (Murray). Notably, the heating pad was designed to reach 118°F +/- 15 on low, 132°F +/- 15 on medium, and 145°F +/- 15 on high. Def.'s Ex. F, ECF No. 55-7 at 2.

[1] Citations in this section are to provide background. Unless noted as undisputed or a factual finding, these citations do not serve as a finding of fact.

Like Barton, Sunbeam retained an electrical engineer. *See* Wright expert report, Defs.' Ex. G, ECF No. 53-8. Sunbeam's engineer tested the subject heating pad and an "exemplar" heating pad to determine whether there was any defect in the subject heating pad that could have caused it to burn Barton. *Id.* Among other things, that test measured whether the heating pads complied with the maximum-temperature standard established by Underwriters Laboratories Inc. ("UL")—that is, whether the pads remained below 194°F initially and then below 176°F 20 minutes after their thermostats first opened. *Id.* at 25–26. During testing, the subject heating pad reached temperatures higher than it was designed to reach or was permitted to reach under the UL standard. *Id.* at 26. The engineer noted that the subject heating pad had a fold, as shown in the image below, that an "exemplar" pad of the same model did not have. *Id.* at 8, 26.



Figure 4. Comparison between the surfaces of the subject heating pad (top) and an exemplar heating pad (bottom) with their polyester covers removed.

*Id.* at 19. The engineer opined that the fold caused the pad to reach those high temperatures. *Id.* At the same time, the engineer also tested the "exemplar" heating pad and that pad likewise reached temperatures higher than those it was designed to reach or was permitted to reach.[2] *Id.* at 29, 31. The engineer also noted that the subject heating pad had a warning tag affixed to its electrical cord, which is shown in the image below.




ECF No. 53-8 at 52; *see id.* at 34. Notably, those warnings state that "BURNS WILL RESULT FROM IMPROPER USE" and "TO REDUCE THE RISK OF BURNS, . . . THIS PRODUCT MUST BE USED IN ACCORDANCE WITH THE FOLLOWING INSTRUCTIONS," including that "THIS PAD IS NOT TO BE USED BY . . . A PERSON WITH DIABETES." *Id.* at 34. The tag also warns that "BURNS MAY OCCUR REGARDLESS OF CONTROL SETTING. CHECK THE SKIN UNDER THE PAD FREQUENTLY TO AVOID BURNING AND BLISTERING. *Id.*

---

[2] Barton's engineering expert likewise tested the heating pad and found that it reached temperatures beyond those it was designed to reach, but he did not explain whether those temperature spikes occurred at the fold. *Contrast* ECF No. 53-8 at 25–26, *with* ECF No. 53-9 at 6–8, *and* ECF No. 53-10 at 58.

## II. Legal standard

Summary judgment is appropriate when the pleadings and admissible evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). At the summary-judgment stage, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). If reasonable minds could differ on material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the facts are undisputed; the case must then proceed to the trier of fact. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Once the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323. "To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial." *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018). "When simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both motions[] before ruling on each of them." *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)).

## III. Discussion

### A. I deny the request to exclude Walmart's experts, but grant the request to exclude Barton's.

#### *1. Walmart's Experts*

Barton seeks to exclude Walmart from relying on Sunbeam's experts, arguing that Walmart failed to timely disclose its intent to rely on those experts. ECF Nos. 52, 61, 66. But this

court has already declined to sanction Walmart related to its expert disclosures. ECF No. 79. And without a basis for reconsideration, that ruling is the law of the case. *See, e.g.*, *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018) ("The law-of-the-case doctrine generally provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" (quotation omitted)). Accordingly, Walmart is not prohibited from relying on Sunbeam's experts.

### *2. Barton's Experts*

Calling upon Federal Rule of Civil Procedure (FRCP) 26(a)(2)(B), Walmart argues[3] that certain opinions of Barton's experts should be excluded because Barton's counsel "ghost-wrote" those sections of the experts' reports. ECF No. 55. Specifically, Walmart seeks to exclude the opinion, which all three experts included in their reports, that the heating pad was defective because it was designed to reach temperatures that could cause burns within minutes while providing no therapeutic benefit. *Id.* at 15 (citing ECF No. 55-12 at 7–8; ECF No. 55-13 at 34–35; ECF No. 55-14 at 5–10.).

Barton argues that FRCP 26(a)(2)(B) does not preclude counsel from assisting experts in preparing their reports. ECF No. 66 at 20. She also asserts that each expert's report included the bases of their opinions and therefore satisfied the rule. *Id.*

Under FRCP 26(a)(2)(B), expert witness disclosures "must be accompanied by a written report" that is "prepared and signed by the witness" if the witness is retained or employed to provide expert testimony. Subsections (i) through (vi) of the rule list several items that must be included in the report, including "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). The Advisory Committee Notes states that "Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports, and indeed, with experts such as automobile mechanics, this

---

[3] Walmart raises several additional arguments to support its motion to exclude the experts, *see* ECF No. 55 at 12–23; however, I need not reach those arguments given my findings in this section.

assistance may be needed," but "the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness." Fed. R. Civ. P. 26(a)(2)(B) advisory committee's note to 1993 amendment. "If a party fails to provide information or identify a witness as required by Rule 26(a) . . . , the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "This automatic sanction provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence, whether at a trial, at a hearing, or on a motion, such as one under Rule 56." Fed. R. Civ. P. 37(c) advisory committee's note to 1993 amendment.

There is no binding authority interpreting the "prepared . . . by the witness" language of FRCP 26(a)(2)(B). I therefore look to the plain meaning of the rule. *See Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 540 (1991) ("We give the Federal Rules of Civil Procedure their plain meaning." (citation omitted)).

Black's Law Dictionary defines "prepare" as providing "with necessary means" or "what is appropriate or necessary." *Prepare*, Black's Law Dictionary (6th ed. 1990).[4] Webster's II New Riverside University Dictionary defines "prepare" as "[t]o make ready in advance for a particular purpose" or "[t]o put together or make by combining various elements or ingredients." *Prepare*, Webster's II New Riverside University Dictionary (1994). Considering those definitions and the context in which the word "prepare" is used, "prepare" within FRCP 26(a)(2)(B) means that an expert must decide what information is responsive to subsections (i) through (vi) and ensure

[4] The "prepared . . . by the witness" language was added in 1993. *Compare* Fed. R. Civ. P. 26(a) (1991), https://access.heinonline.com/HOL/P?h=hein.usfed/frucipf1991&i=50 (last visited Oct. 7, 2026), *with* Fed. R. Civ. P. 26(a)(2)(b) (1993), https://access.heinonline.com/HOL/P?h=hein.usfed/frucipf1993&i=54 (last visited Oct. 7, 2026). I therefore look to definitions around that time frame to determine the meaning of the word "prepare." *See, e.g.*, *In re Svenhard's Swedish Bakery*, 154 F.4th 1100, 1104 (9th Cir. 2025) (explaining that to determine a term's ordinary, contemporary, and common meaning, it is the common practice to consult dictionary definitions and look to how a term was defined at the time the statute was adopted), *cert. denied sub nom. Svenhard's Swedish Bakery v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 146 S. Ct. 2672 (2026).

that information is memorialized in the expert's written report. Importantly, the drafters could have required the experts to have "written" the report, but they chose for the experts to have "prepared" the report. *Compare* Fed. R. Civ. P. 26(a)(2)(B)(i) ("*prepared* . . . by the witness" (emphasis added)), *with* Fed. R. Civ. P. 26(a)(2)(B)(i) ("this disclosure must be accompanied by a *written* report"(emphasis added)). Accordingly, to "prepare" the report is not the same as to "write" the report, suggesting that an expert need not put "pen to paper (or fingers to keyboard)." *Avila v. Ford Motor Co.*, 796 F. Supp. 3d 593, 597 (N.D. Cal. 2025). Even more, the rule requires the expert to prepare "*a* written report," which is different than preparing *part* of a report or even *most* of a report. Fed. R. Civ. P. 26(a)(2)(B) (emphasis added). Thus, for an expert disclosure to satisfy FRCP 26(a)(2)(B), the expert's written report must include the information listed in subsections (i) through (vi) and the expert must be the one to decide what information is responsive to those subsections; although, the expert need not be the one to memorialize that information within the report.

While I find that language unambiguous, Barton calls upon the Advisory Committee Notes to argue that her counsel's actions were permissible, so for completeness of my decision, I consider the notes. *See Waetzig v. Halliburton Energy Servs., Inc.*, 604 U.S. 305, 312 (2025) (stating that "the Federal Rules Advisory Committee's Notes . . . are a reliable source of insight into the meaning of a rule" (citation modified)). And in doing so, while assuming, without deciding, that FRCP 26(a)(2)(B), is ambiguous, the notes do not alter my interpretation. The Advisory Committee Notes state that counsel can provide "assistance to experts in preparing the reports." Fed. R. Civ. P. 26(a)(2)(B) advisory committee's note to 1993 amendment. I am not persuaded that note means that an attorney can decide what information is responsive to subsections (i) through (vi). Indeed, that would mean that an attorney could tell his expert to consider only certain data or to reach a particular conclusion. I reject such an interpretation because it would lead to an unreasonable result—that is, it would all but eliminate the need for expert disclosures as an attorney could just draft an "expert report" and have their retained expert sign it. *Cf. Yim v.*

*City of Seattle*, 63 F.4th 783, 792 (9th Cir. 2023) ("[W]e are not required to interpret a statute in a formalistic manner when such an interpretation would produce a result contrary to the statute's purpose or lead to unreasonable results." (quotation omitted)).

In reality, the note suggests that an expert may ask an attorney to perform a particular task to help the expert decide what information to put into the report. For example, an expert might ask the attorney to send him copies of documents the attorney obtained through discovery, such as a plaintiff's medical records or a plaintiff's deposition testimony. An expert might also ask an attorney whether a particular document would be an effective exhibit, and the reasons for the attorney's belief that document is relevant. Finally, an expert might even ask an attorney to review his report to ensure none of the information required by FRCP 26(a)(2)(B) was missing. But those scenarios are starkly different than an attorney telling an expert what data to rely upon or what conclusion to reach, much less dictating the specifics of the expert's conclusion(s). Even more, the plain text of the rule states nothing about an *attorney* preparing any part of the report. It states only that an *expert* must prepare the report. Because "it is the text of the rules that control, and 'the [n]otes cannot . . . change the meaning that the Rules would otherwise bear," I do not interpret FRCP 26(a)(2)(B) as permitting an attorney to "prepare" any part of the report. *In re Kirkland*, 75 F.4th 1030, 1043 (9th Cir. 2023) (quotation omitted). That is, as already explained, for an expert disclosure to satisfy FRCP 26(a)(2)(B), the expert's written report must include the information listed in subsections (i) through (vi) and the expert must be the one to decide what information is responsive to those subsections.[5] While an attorney

---

[5] I acknowledge that this determination is fact specific and can, at times, be a close call. *See, e.g.*, *Pat. Category Corp. v. Target*, 2008 WL 11336468, at *3 (C.D. Cal. July 17, 2008) (collecting cases); *Avila v. Ford Motor Co.*, 796 F. Supp. 3d 593, 597 (N.D. Cal. 2025) (declining to exclude an expert when he "testified at his deposition that he reviewed all of the cited documents himself and that he 'drafted the vast majority of [the report]'"); *NetFuel, Inc. v. Cisco Sys. Inc.*, 2020 WL 1274985, at *3 (N.D. Cal. Mar. 17, 2020) (declining to exclude an expert when he "not only wrote a significant portion of his report, but also provided the information, analyses, and opinions expressed in the report" as "confirmed by the fact that [the expert] spent over 100 hours . . . working on his Opening Report and 'provided feedback on multiple drafts of the report before applying his signature'"); *Accentra Inc. v. Staples, Inc.*, 2010 WL 11459205, at *5 (C.D. Cal. Oct. 7, 2010) (finding that, "[w]hile a close call," an expert "was involved enough to have 'prepared' the

may help perform particular tasks at the request of the expert, the attorney may not decide what information to include. The reason for this is obvious: if the attorney is making that decision, it is the attorney's report, not the expert's.

Here, it appears that Barton's counsel was involved in reaching one conclusion that is included in all three expert reports. All three experts—one a burn surgeon, one an electrical engineer, and one a product safety manager—concluded that the heating pad was "unreasonably dangerous" because the temperatures it was designed and manufactured to reach were "excessive, unnecessary and provided no extra therapeutic benefit." ECF No. 55-12 at 8 (Brones); ECF No. 55-13 at 35 (Kitzes); ECF No. 55-14 at 6–7 (Murray). Even more curious, despite their varying backgrounds, all three experts considered the *same* data and summarized that data in nearly identical prose. ECF No. 55-12 at 7–8 (Brones); ECF No. 55-13 at 34–35 (Kitzes); ECF No. 55-14 at 5–7 (Murray).

The experts attempted to demonstrate that they made the ultimate decision on what should be included in their report during their depositions. But their testimony only further supports the conclusion that Barton's counsel either told the experts the conclusion they needed to reach before any expert analysis was done, or counsel provided them with the specific information he wanted them to analyze in order to reach the desired conclusion—that is, that the heating pad was unreasonably dangerous. Indeed, Brones testified that he "went back and forth . . . on the phone . . . discussing the language," presumably with counsel, but that he "felt comfortable with that language, and that's what [he] wrote in the report." ECF No. 55-18 at 10–11.

---

document to satisfy Rule 26" when she testified that "she worked with [the defendant's] attorneys 'as a group' and 'as a team' to create the report, indicating that she was, in fact, substantively involved in its creation" even though she also testified "that an outline existed before her meeting with counsel"). In this case, however, it is clear that Barton's counsel decided, at least in part—if not in full—what was included in the report.

Next, Murray did not discuss—at least not in the excerpts provided by Walmart—whether he drafted those portions of his report. But his report is suspect because Murray testified in a different case, *Jones*,[6] that he "personally drafted" a report with very similar language, but he did "work with [Barton's counsel] on some of the sections." ECF No. 55-21 at 9–10. As to the language that is nearly identical to the language at issue here, he testified that Barton's counsel may have provided him with that language, but he thought he "edited it." *Id.* at 12. He added that the report "was all drafted by [him], and it's definitely something where [Barton's counsel] and [he] did go back and forth on it." *Id.* at 12. This chart shows the identical language:

| Murray's *Barton* Report | Murray's *Jones* Report |
|---|---|
| In 1946 Moritz and associates published a study from Harvard regarding the relationship between time and thermal exposures causing severe burn injuries. Skin contact exposure to a temperature of 116°F can cause complete epidermal necrosis and third-degree burns in just eighteen minutes. At a temperature of 120°F, third-degree burns occur in less than ten minutes. Moreover, severe burns can be sustained at 116°F without any noticeable discomfort. Defendants have admitted that they were aware of this study at the time that the subject heating pad was manufactured.<br><br>This industry knowledge has been confirmed multiple times over the past several decades by the American Society for Testing and Materials (ASTM). ASTM publication C1055-20, "Standard Guide for Heated System Surface Conditions that Produce Contact Burn Injuries," since 1986 and as recently as 2020, has confirmed the same information; that third-degree burns can occur in less than 20 minutes of skin contact | In 1946 Moritz and associates published a study from Harvard regarding the relationship between time and thermal exposures causing severe burn injuries. Skin contact exposure to a skin temperature of 116°F can cause complete epidermal necrosis and third-degree burns in just eighteen minutes. At a skin temperature of 120°F, third-degree burns occur in less than ten minutes. Moreover, severe burns can be sustained at 116°F without any noticeable discomfort. Defendants have admitted that they were aware of this study at the time that the subject heating pad was manufactured.<br><br>This industry knowledge has been confirmed multiple times over the past several decades by the American Society for Testing and Materials (ASTM). ASTM publication C1055-20, "Standard Guide for Heated System Surface Conditions that Produce Contact Burn Injuries," since 1986 and as recently as 2020, has confirmed the same information; that third-degree burns can occur in less than 20 minutes of skin contact |

[6] *Jones v. CVS Pharmacy, Inc.*, Case No. 2:25-cv-00150-RFB-EJY (D. Nev.).

| | |
|---|---|
| with temperatures of 116°F. ASTM cites to and recognizes the continued validity of 1946 Harvard studies from A.R. Moritz, MD and F.C. Henriques, MD. Defendants have admitted that they were aware of this information at the time that the subject heating pad was manufactured.<br><br>The FDA and CPSC issued a Public Health Advisory in 1995 warning more than 1,600 heating pad burns were treated in emergency departments each year, and there are an average of eight deaths per year attributed to heating pads. Defendants have admitted that they were aware of this Public Health Advisory at the time that the subject heating pad was manufactured. In the FDA MAUDE database, records from 3/15/2018 to 8/29/2025 show 318 reports of burn injuries from Sunbeam heating pads.<br><br>The subject heating pad is a Class 2 medical device and regulated by the FDA. FDA Recognized Consensus Standards: Medical Devices, FR Recognition Number 19-49, recognizes the International Electrotechnical Commission standard, IEC 60601-01 as the applicable standard. IEC 60601-01, Table 24, states that the maximum temperature for applied medical devices intended to provide heat to a patient for greater than 1 minutes cannot exceed 48°C (118.4°F). Defendants have admitted that they were aware of this information at the time that the subject heating pad was manufactured.<br><br>. . .<br><br>Despite this knowledge, the Defendants knowingly, and intentionally designed, had manufactured, distributed and sold the subject heating pad with the knowledge that it was designed and tested to reach 118° +/- 15° F in the Low setting, 132° +/- 15° F in the Medium setting, and 145° +/- 15° F in the High setting. Each of these temperatures were | with temperatures of 116°F. ASTM cites to and recognizes the continued validity of 1946 Harvard studies from A.R. Moritz, MD and F.C. Henriques, MD. Defendants have admitted that they were aware of this information at the time that the subject heating pad was manufactured.<br><br>The FDA and CPSC issued a Public Health Advisory in 1995 warning more than 1,600 heating pad burns were treated in emergency departments each year, and there are an average of eight deaths per year attributed to heating pads. Defendants have admitted that they were aware of this Public Health Advisory at the time that the subject heating pad was manufactured. In the FDA MAUDE database, records from 3/15/2018 to 8/29/2025 show 318 reports of burn injuries from Sunbeam heating pads.<br><br>The subject heating pad is a Class 2 medical device and regulated by the FDA. FDA Recognized Consensus Standards: Medical Devices, FR Recognition Number 19-49, recognizes the International Electrotechnical Commission standard, IEC 60601-01 as the applicable standard. IEC 60601-01, Table 24, states that the maximum temperature for applied medical devices intended to provide heat to a patient for greater than 1 minutes cannot exceed 48°C (118.4°F). Defendants have admitted that they were aware of this information at the time that the subject heating pad was manufactured.<br><br>. . . .<br><br>Despite this knowledge, the Defendants knowingly, and intentionally designed, had manufactured, distributed and sold the subject heating pad with the knowledge that it was designed and tested to reach 115° F+/- 15° F on the Warm setting, 120° F+/- 15° F on the Low setting, 135° F +/-15° F on the Medium setting, and 145° F +/- 15° F on the |

| | |
|---|---|
| excessive, unnecessary and provided no extra therapeutic benefit. Accordingly, the subject heating pad was unreasonably dangerous. | High setting. Each of these temperatures were excessive, unnecessary and provided no extra therapeutic benefit. Accordingly, the subject heating pad was unreasonably dangerous. |
| ECF No. 55-14 at 5–7. | ECF No. 55-17 at 5–6. |

Finally, Kitzes testified that he "[a]bsolutely" wrote that language and that "[n]o one gave [him] that wording." ECF No. 55-19 at 11, l. 4, 7. However, when discussing nearly the same language in his report in *Jones*, Kitzes testified that he "discussed" that language "with [Barton's counsel]" and "incorporate[d]" it. ECF No. 55-20 at 9, ll. 12–13. He explained that Barton's counsel "gave [him] those sentences and [he] said, okay, [he] c[ould] incorporate them because [he] believe[d] them." *Id.* at 10, ll. 11–13. He clarified however, that "everything in [t]here [we]re things that [he] either wrote or clearly agree[d] with that [we]re collateral or adjacent to them" and that while "[s]ome of the words, some of the sentences, came from [Barton's counsel]," "certainly not all of them" did. *Id.* at 10, ll. 17–19; *id.* at 11, ll. 6–8. This chart reveals the identical language used by Kitzes:

| Kitzes's *Barton* Report | Kitzes's *Jones* Report |
|---|---|
| 12. . . . In 1946 Moritz and associates published a study from Harvard regarding the relationship between time and thermal exposures causing severe burn injuries. Skin contact exposure to a temperature of 116°F can cause complete epidermal necrosis and third-degree burns in just eighteen minutes. At a temperature of 120°F, third-degree burns occur in less than ten minutes. Moreover, severe burns can be sustained at 116°F without any noticeable discomfort. Defendants have admitted that they were aware of this study at the time that the subject heating pad was manufactured.<br><br>This industry knowledge has been confirmed multiple times over the past several decades by the American Society for Testing and Materials (ASTM). ASTM publication | 12. In 1946 Moritz and associates published a study from Harvard regarding the relationship between time and thermal exposures causing severe burn injuries. Skin contact exposure to a temperature of 116°F can cause complete epidermal necrosis and third-degree burns in just eighteen minutes. At a temperature of 120°F, third-degree burns occur in less than ten minutes. Moreover, severe burns can be sustained at 116°F without any noticeable discomfort. Defendants have admitted that they were aware of this study at the time that the subject heating pad was manufactured.<br><br>This industry knowledge has been confirmed multiple times over the past several decades by the American Society for Testing and Materials (ASTM). ASTM publication |

| | |
|---|---|
| C1055-20, "Standard Guide for Heated System Surface Conditions that Produce Contact Burn Injuries," since 1986 and as recently as 2020, has confirmed the same information; that third-degree burns can occur in less than 20 minutes of skin contact with temperatures of 116°F. ASTM cites to and recognizes the continued validity of 1946 Harvard studies from A.R. Moritz, MD and F.C. Henriques, MD. Defendants have admitted that they were aware of this information at the time that the subject heating pad was manufactured.<br><br>The FDA and CPSC issued a Public Health Advisory in 1995 warning more than 1,600 heating pad burns were treated in emergency departments each year, and there are an average of eight deaths per year attributed to heating pads. Defendants have admitted that they were aware of this Public Health Advisory at the time that the subject heating pad was manufactured.<br><br>The subject heating pad is a Class 2 medical device and regulated by the FDA. FDA Recognized Consensus Standards: Medical Devices, FR Recognition Number 19-49, recognizes the International Electrotechnical Commission standard, IEC 60601-01 as the applicable standard. IEC 60601-01, Table 24, states that the maximum temperature for applied medical devices intended to provide heat to a patient for greater than 10 minutes cannot exceed 43°C (109.4°F). Defendants have admitted that they were aware of this information at the time that the subject heating pad was manufactured.<br><br>Despite this knowledge, the Defendants knowingly, and intentionally distributed the subject heating pad with the knowledge that it was designed and tested to reach 118° +/- 15° F in the Low setting, 132° +/- 15° F in the Medium setting, and 145° +/- 15° F in the High setting. Each of these temperatures were | C1055-20, "Standard Guide for Heated System Surface Conditions that Produce Contact Burn Injuries," since 1986 and as recently as 2020, has confirmed the same information; that third-degree burns can occur in less than 20 minutes of skin contact with temperatures of 116°F. ASTM cites to and recognizes the continued validity of 1946 Harvard studies from A.R. Moritz, MD and F.C. Henriques, MD. Defendants have admitted that they were aware of this information at the time that the subject heating pad was manufactured.<br><br>The FDA and CPSC issued a Public Health Advisory in 1995 warning more than 1,600 heating pad burns were treated in emergency departments each year, and there are an average of eight deaths per year attributed to heating pads. Defendants have admitted that they were aware of this Public Health Advisory at the time that the subject heating pad was manufactured.<br><br>The subject heating pad is a Class 2 medical device and regulated by the FDA. FDA Recognized Consensus Standards: Medical Devices, FR Recognition Number 19-49, recognizes the International Electrotechnical Commission standard, IEC 60601-01 as the applicable standard. IEC 60601-01, Table 24, states that the maximum temperature for applied medical devices intended to provide heat to a patient for greater than 10 minutes cannot exceed 43°C (109.4°F). Defendants have admitted that they were aware of this information at the time that the subject heating pad was manufactured.<br><br>Despite this knowledge, the Defendants knowingly, and intentionally distributed the subject heating pad with the knowledge that it was designed and tested to reach 115° +/- 15° F on the Warm setting, 120° +/- 15° F on the Low setting, 135° +/- 15° F on the Medium setting, and 145° +/- 15° F on the |

| | |
|---|---|
| excessive, unnecessary and provided no extra therapeutic benefit. Accordingly, the subject heating pad was unreasonably dangerous. Moreover, the testing performed on the subject heating pad by defendants' own experts at Exponent, showed that the subject heating pad achieved temperatures ranging from 140°F up to 206°F. | High setting. Each of these temperatures were excessive, unnecessary and provided no extra therapeutic benefit. Accordingly, the subject heating pad was unreasonably dangerous. Moreover, the testing performed on the subject heating pad by Defendants' own experts at Exponent, showed that the subject heating pad achieved temperatures ranging from 150°F to the 160s °F. |
| ECF No. 55-13 at 34–35. | ECF No. 55-16 at 28–29. |

All three experts considered the same sources of information (seemingly given to them by counsel) to reach the same conclusion, using the same phrasing for that conclusion. There is no information showing the experts conducted any independent review or research to form or even confirm the conclusion. Given that, together with the admissions that Barton's counsel provided them with that language, I find that it was Barton's counsel—not the experts—that decided to include the sources of information and the conclusion Walmart challenges. Barton thus failed to "identify a witness as required by Rule 26(a)" because the experts did not "prepare" their entire reports. Fed. R. Civ. P. 37(c)(1).

When a party fails to "provide information or identify a witness as required by Rule 26(a) . . . , the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard" may impose lesser sanctions. *Id.* But Barton did not argue or otherwise establish that her failure to identify her witnesses as required by Rule 26(a)(2)(B) was substantially justified or harmless, so she cannot "escape the 'harshness' of exclusion." *See Merchant v. Corizon Health, Inc.*, 993 F.3d 733, 740 (9th Cir. 2021) (quoting *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001), and explaining that the burden is on the party facing sanctions and if the noncompliant party fails to argue substantial justification or harmlessness, "a district court need not hold a sua sponte hearing on that issue before imposing Rule 37(c)(1)'s default

sanction"). And while Barton could have potentially escaped exclusion by requesting lesser sanctions, she likewise failed to do so. *See* Fed. R. Civ. P. 37(c)(1); *Merchant*, 993 F.3d at 740 (explaining that "if the noncompliant party fails to move for lesser sanctions, the district court is not required to consider one and does not abuse its discretion in excluding evidence where such action is otherwise justified"). Barton therefore "is not allowed to use [her expert] witness[es]" in her case-in-chief to opine as to the reasonableness of the temperatures the pad was designed to reach, including whether a lower temperature would have provided therapeutic benefit.[7] FRCP 37(c)(1).

### B. Plaintiff's motion for partial summary judgment (ECF No. 52) is denied.

Relying exclusively on her experts, Barton argues that she should be granted partial summary judgment against Walmart as to her strict liability claim arising from a design and manufacturing defect. ECF No. 52 at 2. She also argues that Walmart cannot dispute her evidence because Walmart's experts should be excluded as untimely. *Id.* Because Barton's experts have been excluded, Barton fails to meet her burden that there is no genuine dispute of material fact. Her motion is denied.[8]

### C. Sunbeam's motion for summary judgment (ECF No. 53) is granted in part and denied in part.

Sunbeam moved for summary judgment on Barton's strict-liability claim based on a manufacturing defect, design defect, and failure to warn; Barton's negligence claim; and Barton's request for punitive damages. ECF No. 53. Barton opposes the motion.[9] ECF No. 60. I address each of Sunbeam's arguments in turn.

[7] Although Sunbeam did not move to exclude Barton's experts, I nevertheless exclude them when resolving Sunbeam's motion for summary judgment. FRCP 37(c)(1) provides that if a party fails to provide information or identify a witness, the party is not allowed to use that information or witness. That said, excluding Barton's experts is not dispositive in resolving Sunbeam's motion.

[8] Sunbeam filed an opposition to this motion. *See* Opp'n, ECF No. 58; Reply, ECF No. 68. Although I am doubtful Sunbeam has standing to oppose Barton's motion against *Walmart*, I need not reach Sunbeam's opposition based on my findings in this section.

[9] Barton also filed an opposition to Walmart's joinder. Opp'n, ECF No. 61; Reply, ECF No.70. In her opposition, Barton again argues that Walmart's experts should be excluded. That argument fails for the

### *1. Strict Liability*

"Under the law of strict liability in [Nevada], responsibility for injuries caused by defective products is properly fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market." *Allison v. Merck & Co.*, 878 P.2d 948, 952 (Nev. 1994). "Although manufacturers are not insurers of their products, where injury is caused by a defective product, responsibility is placed upon the manufacturer and the distributor of the defective product rather than on the injured consumer." *Id.* Nevada "recognize[s] three categories of strict tort liability claims: manufacturing defects, design defects, and the failure to warn." *Ford Motor Co. v. Trejo*, 402 P.3d 649, 653 (Nev. 2017). "To bring successfully a strict products liability claim, a plaintiff must show that: 1) the product had a defect which rendered it unreasonably dangerous, 2) the defect existed at the time the product left the manufacturer, and 3) the defect caused the plaintiff's injury." *Fyssakis v. Knight Equip. Corp.*, 826 P.2d 570, 571 (Nev. 1992).

"In the realm of manufacturing and design defects, [Nevada] has consistently applied the consumer-expectation test to determine liability." *Ford Motor Company*, 402 P.3d at 653. "Under the consumer expectation test, a plaintiff must demonstrate that a product 'failed to perform in the manner reasonably to be expected in light of its nature and intended function and was more dangerous than would be contemplated by the ordinary user having the ordinary knowledge available in the community.'" *Id.* at 652 (quotation omitted). "In the context of proving that a product was defective under the consumer-expectation test, this court has concluded that '[a]lternative design is one factor for the jury to consider when evaluating whether a product is unreasonably dangerous,'" so "a plaintiff may choose to support their case with evidence 'that a safer alternative design was feasible at the time of manufacture.'" *Id.* at 653–54 (quotation omitted). "[E]vidence related to instructions and warnings included with the product, as well as

---

same reason as already discussed. Barton's opposition to Walmart's joinder is otherwise the same as her opposition to Sunbeam's motion for summary judgement. Accordingly, I do not separately address Barton's opposition to Walmart's joinder.

product advertising and marketing, [are] relevant to prove a reasonable consumer's expectations with respect to the product." *Id.* at 656.

As to the failure to warn, "a product must include a warning that adequately communicates the dangers that may result from its use or foreseeable misuse; otherwise, the product is defective." *Fyssakis*, 826 P.2d at 571–72. "[W]arnings in the context of products liability claims must be (1) designed to reasonably catch the consumer's attention, (2) that the language be comprehensible and give a fair indication of the specific risks attendant to use of the product, and (3) that warnings be of sufficient intensity justified by the magnitude of the risk." *Lewis v. Sea Ray Boats, Inc.*, 65 P.3d 245, 250 (Nev. 2003). "[T]he burden of proving causation can be satisfied in failure-to-warn cases by demonstrating that a different warning would have altered the way the plaintiff used the product or would have 'prompted plaintiff to take precautions to avoid the injury.'" *Rivera v. Philip Morris, Inc.*, 209 P.3d 271, 275 (Nev. 2009) (quotation omitted).

***a. Design Defect***

Sunbeam raises several arguments why it is entitled to summary judgment as to Barton's strict liability claim arising from a design defect. First, Sunbeam argues that there is no evidence demonstrating that the heating pad did not perform in the manner reasonably intended. ECF No. 53 at 10–11. In support of that assertion, Sunbeam contends that the heating pad, when used correctly, is safe and effective, as evidenced by the fact that Barton's daughter used the same heating pad without incident and that other witnesses testified to using a heating pad without incident. *Id.* at 11. Sunbeam adds that "the heating pad was designed and intended to be used in accordance with its instructions and warnings," including the warning that someone with diabetes should not use the pad, but Barton, "who has diabetes, used the pad in violation of th[at] instruction and warning." [10] *Id.*

[10] Sunbeam also contends that the heating pad "operated within the designed temperatures at all areas of the pad, except for the one spot where the heating elements had been deformed and damaged as the result of misuse," meaning that the deformation did not exist at the time it left the manufacturer. ECF No. 53 at 11. But this argument is more appropriately addressed in the section of this order discussing

Second, Sunbeam argues that there is no evidence demonstrating that the heating pad was designed to reach temperatures that were excessive or unnecessary. Sunbeam relies on Brones's testimony[11] stating that people experience therapeutic relief at different temperatures. ECF No. 53 at 12. Sunbeam also relies on Murray's testimony stating that he did not know whether every person who used a heating pad above 116°F would sustain a burn and that he could not explain why Barton's daughter did not sustain a burn using the same pad when the pad reached a temperature higher than 116°F. *Id.*

Third, Sunbeam argues that no evidence exists to demonstrate that the heating pad was more dangerous than would be contemplated by the ordinary user having the ordinary knowledge available in the community. ECF No. 53 at 13–14. Sunbeam asserts that people use heating pads precisely because they get hot and that the heating pad at issue here had a warning that informed users that the pad could cause burns if used improperly—whether on low, medium, or high—and that a user should check their skin regularly during use. *Id.* at 13. Sunbeam adds that it tested whether a user would comprehend those warnings and found that users largely would. *Id.* at 14.

Fourth, Sunbeam argues that Barton failed to produce evidence of a feasible alternative design. ECF No. 53 at 14–15. According to Sunbeam, Barton failed to produce evidence that heating pads at lower temperatures would be commercially feasible when people experience therapeutic relief at different temperatures, including at temperatures higher than 116°F, and Barton did not identify a single heating pad designed to reach only 114°F or 116°F. *Id.* at 15.

whether the heating pad suffered from a manufacturing defect, so I discuss this argument there and do not address it further here.

[11] Any reference throughout this discussion section to the excluded opinions of Barton's experts is just to summarize the parties' arguments. The court did not consider these opinions in resolving the parties' motions.

Relevant to Sunbeam's first, second, and third argument, Barton contends that the temperatures the pad was designed to reach were unreasonably dangerous as evidenced by peer-reviewed, scientific studies; expert testimony; and certain standards instituted by a regulatory government agency and UL. ECF No. 60 at 23–24. Barton also asserts that Sunbeam's own expert conceded that "if the skin temperature is held at temperatures above approximately 50°C (122°F) for 6 minutes, skin burns can occur" and that "[t]he maximum temperature requirements of UL 130 Section 27.[1] . . . are high enough that burns can occur." *Id.* at 24 (emphasis removed). Citing *Ford Motor Company*, 133 Nev. at 529, Barton adds that the pad's warning labels may be relevant to determine liability but are not dispositive. *Id.* at 24. Finally, as to the question of any feasibly alternative design, Barton asserts that Brones and Murray both testified that therapeutic benefit is obtained at 104°F and that heating pads should not exceed 114°F or 116°F. ECF No. 60 at 25.

Sunbeam fails to meet its burden showing summary judgment is warranted. First, Sunbeam fails to demonstrate that there is no genuine dispute of material fact as to whether the heating pad performed in the manner reasonably intended. Sunbeam attached the report of its engineering expert outlining his test of the heating pads. ECF No. 53-8. Specifically, the expert tested what temperatures the subject heating pad and an "exemplar" heating pad reached over a four-hour period. *Id.* at 16–31. The expert found that both pads reached temperatures above those they were designed to reach and above the UL 130 standard. ECF No. 53-8 at 26, 29, 31. The expert opined that Barton's pad exceeded the designed temperatures because of the fold in the pad. ECF No. 53-9 at 26. But the exemplar pad had no such fold and still exceeded the designed temperatures. ECF No. 53-8 at 19, 31. Also, that report included a 1995 public health advisory by two government agencies stating that "more than 1,600 heating pad burns are treated each year in hospital emergency rooms." *Id.* at 48. And Sunbeam attached deposition testimony by its corporate representative stating that Sunbeam received four or five complaints of burns associated with models similar to the model at issue here within a three-year period;

albeit the representative clarified that was out of the 2.3 million heating pads it sold during that time. ECF No. 53-4 at 52–53; ECF No. 53-4 at 131, ll. 2–12. The representative also testified that all but one of the eight to ten depositions she has testified in as a corporate representative involved a burn from a heating pad. ECF No. 53-4 at 21, ll. 9–16. That is enough to create a genuine dispute of material fact whether the subject heating pad's design permitted it to reach temperatures hotter than intended.

Second, Sunbeam fails to demonstrate that there is no genuine dispute of material fact as to whether the heating pad was designed to reach temperatures that were excessive or unnecessary. While Sunbeam's corporate representative testified that Sunbeam's customers experience relief at different temperatures, the corporate representative also stated that Sunbeam hired a third-party to perform several studies and those studies revealed that pain associated with arthritis, muscle tension and stress, and menstrual cramps could be relieved at temperatures around 104°F; albeit some of that relief was experienced with direct-skin contact unlike the subject heating pad, which has a cover. ECF No. 53-4 at 117–26. Sunbeam also provided the 1995 public health advisory stating that "[p]rolonged use on one area of the body can cause a severe burn, even when the heating pad is at a low temperature setting." ECF No. 53-8 at 48. And it provided the warnings affixed to the tag of the heating pad, which state that burns can occur using the pad on any setting. ECF No. 53-8 at 34. That creates a genuine dispute of material fact whether it was necessary for Sunbeam to design the subject heating pad to reach 118°F +/- 15 on low, 132°F +/- 15 on medium, and 145°F +/- 15 on high.

Third, Sunbeam fails to demonstrate it is entitled to summary judgment as a matter of law simply because the subject heating pad had a warning label stating that the pad could cause burns and people generally expect heating pads to get hot. While such evidence is relevant to prove a reasonable consumer's expectations with respect to a product, *see Ford Motor Company*, 402 P.3d at 656, a juror could nevertheless disagree that the heating pad here was more dangerous than would be contemplated by the ordinary user having the ordinary knowledge

available in the community. Instead, a juror could decide that an ordinary user having ordinary knowledge may not contemplate that a heating pad could cause the kind of burn Barton experienced.

Fourth, Sunbeam fails to demonstrate that the heating pad was not unreasonably dangerous just because Barton did not provide an alternative design. In Nevada, "proof of an alternative design is not required." *Ford Motor Company*, 402 P.3d at 655.

Accordingly, Sunbeam fails to establish that it is entitled to summary judgment on Barton's strict-liability claim arising from a design defect. Walmart likewise, through its joinder, fails to establish that it is entitled to summary judgment.

***b. Manufacturing Defect***

Sunbeam argues that there is no evidence that there was a manufacturing defect when Barton conceded that the heating pad was manufactured in accordance with its design specifications and when the heating pad performed as designed during testing except for the part damaged by misuse (i.e., the fold). ECF No. 53 at 15–16.

Barton disagrees that the pad performed as designed. ECF No. 60 at 21–22. She states that the pad was tested twice after the injury and both times it reached temperatures above those it was designed to reach. *Id.* at 21.

In reply, Sunbeam argues that "the undisputed evidence establishes that the 'temperature spike' occurred only at a place on the pad where the heating coils had been damaged" and the spike is irrelevant to this case because that temperature was recorded while the pad was tested in the 'high' setting, while plaintiff testified that she used the pad on the 'medium' setting." ECF No. 65 at 2.

Sunbeam fails to show that summary judgment is warranted on this claim. As already discussed, Sunbeam's electrical engineer tested the subject heating pad with a fold and an "exemplar" heating pad without a fold and found that both pads reached temperatures above those they were designed to reach. *See* ECF No. 53-8. Indeed, Barton's engineering expert also

tested the subject heating pad and found it reached temperatures beyond those it was designed to reach; but unlike Sunbeam's expert, Barton's expert did not state that the temperature spikes he measured occurred at the fold. *Contrast* ECF No. 53-8 at 25–26, *with* ECF No. 53-9 at 6–8, *and* ECF No. 53-10 at 58. There is therefore a genuine dispute of material fact whether the subject heating pad overheated due to a fold caused by alleged misuse or whether it overheated due to a potential design or manufacturing defect.[12] Accordingly, neither Sunbeam nor Walmart[13] is entitled to summary judgment on Barton's strict-liability claim based on a manufacturing defect.

### *c. Failure to Warn*

Sunbeam argues that there is no evidence demonstrating that the warnings on the heating pad were inadequate. ECF No. 53 at 16–18. Sunbeam further asserts that it studied whether users could comprehend the pad's warnings and found that nearly 100 percent of the 65 volunteers it studied understood from the warnings that there was a possibility of burns and that a person with diabetes should not use the pad. *Id.* at 16. Sunbeam adds that Barton cannot show that any failure to warn caused her injury when she did not see or read the warning label. *Id.* at 17–18.

Citing Kitzes's rebuttal report, *see* ECF No. 60-10, Barton argues that the warnings accompanying the heating pad were inadequate because they were on the pad's electrical cord rather than on the pad itself and should have "beg[a]n with a signal word Danger (white letters on a red background)." ECF No. 60 at 26. Barton also argues that "[t]he warning must include an identification of the hazard, and explanation of how the hazard can create an injury and what can be done to avoid it." *Id.* She adds that Sunbeam's own expert conceded that a warning cannot catch one's attention if it is absent. *Id.* at 27. Further, Barton quotes Sunbeam's corporate representative who testified that warnings do not prevent burns completely, but just "drastically reduce[]" the likelihood of a burn. *Id.*

---

[12] Even if the burden had switched to Barton, the result would be the same because she too attached these reports to her opposition. Pl.'s Ex. 5, ECF No. 60-7; Pl.'s Ex. 6, ECF No. 60-8.

[13] Walmart filed a joinder to Sunbeam's motion. ECF No. 54.

In its reply, Sunbeam argues that even had it put a warning directly on the heating pad, Barton still would not have seen the warning because her daughter placed the pad on her upper back where she could not see the pad herself. ECF No. 65 at 2.

In Nevada, a warning can be deficient because of how it looked (e.g., whether it was designed to reasonably catch the consumer's attention) or because of what it said (e.g., whether the language used in the warning was comprehensible and gave a fair indication of the specific risks attendant to use of the product). *See Lewis*, 65 P.3d at 250.

Sunbeam met its initial burden demonstrating that there is no genuine dispute of material fact whether the heating pad's warnings were defective because of how they looked. *See Koi Design LLC v. Marron Laws., APC*, 184 F.4th 1132, 1141 (9th Cir. 2026) ("Where, as here, the nonmoving party bears the burden of proof at trial, the moving party may secure summary judgment by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." (quoting *Celotex*, 477 U.S. at 325)). However, Barton has met her burden demonstrating that there is a genuine dispute of material fact whether the heating pad's warning was designed to reasonably catch the consumer's attention and whether any such failure in the pad's warning caused her injuries.

Specifically, Barton cites Kitzes's rebuttal expert report, which explained that warnings on the pad itself rather than on the tag attached to its electrical cord would be more noticeable and that the warning should have started with the word "Danger" in white lettering on a red background. ECF No. 60-10 at 12. Barton also attaches her own deposition testimony in which she stated she was not sure whether she would have read or followed the instructions accompanying her daughter's heating pad had she seen them. ECF No. 60-4 at 10–11. This would have entitled Sunbeam to summary judgment, but Barton also attaches the deposition testimony of her daughter stating that the daughter *would have* called Barton's doctor to ask whether Barton could use the heating pad had the daughter seen the warning that the heating pad should not be used by a diabetic. ECF No. 60-3 at 3–4. This gives rise to genuine issue of material fact, so

Sunbeam is therefore not entitled to summary judgment on Barton's strict liability claim arising from a failure to warn based on whether the warning was designed to reasonably catch the consumer's attention. Walmart, through its joinder, is likewise not entitled to summary judgment on this basis.

However, Sunbeam demonstrates there is no genuine dispute of material fact whether a failure to warn caused Barton's burn based on the contents of the warning. Sunbeam attaches Barton's and Barton's daughter's deposition testimony in which both stated that they had not seen the warnings that came with the heating pad. ECF No. 53-2 at 26, 61, 66–67; ECF No. 53-3 at 14–16. And Barton does not point to any evidence in the record demonstrating that either Barton or her daughter saw the warnings. *See* ECF No. 60 at 26–27. "If reasonable minds might differ in drawing a conclusion from the facts presented, a jury should be permitted to decide the issue . . . as an issue of fact." *Rocky Mountain Produce Trucking Co. v. Johnson*, 369 P.2d 198, 202 (Nev. 1962). "On the other hand, if reasonable minds should not differ in drawing a conclusion from the facts presented, a court should decide the issue, as a matter of law." *Id.* Reasonable minds could not differ in concluding that a different warning would not have prevented Barton's injuries when neither Barton nor her daughter saw the warnings. Indeed, the warning could have read, "Marlena Barton, do not use this heating pad because it is certain to burn you and will result in thousands of dollars in medical bills," and Barton would have been none the wiser. Sunbeam is therefore entitled to summary judgment on Barton's strict-liability claim arising from a failure to warn as to the contents of the warning. *See Brown v. SharkNinja Operating, LLC*, 749 F. Supp. 3d 1342, 1361 (N.D. Ga. 2024) (granting summary judgment on a "failure-to-warn claim related to the substance of the warnings" because the plaintiff could not "show the substance of the warnings proximately caused her injuries" when she admitted she did not read the owner's manual or the on-product warning); *Foster v. Ethicon, Inc.*, 529 F. Supp. 3d 992, 1002–03 (D.S.D. 2021) (granting summary judgment on a failure-to-warn claim because there was not a genuine dispute of material fact as to causation when a physician testified that he did not read the

"instructions for use" before implanting a pelvic mesh product into a patient). Walmart, through its joinder, is likewise entitled to summary judgment on this basis.[14]

### *2. Negligence*

To prevail on a negligence claim, the plaintiffs must prove "(1) the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages."[15] *Sanchez v. Wal-Mart Stores, Inc.*, 221 P.3d 1276, 1280 (Nev. 2009). "Causation has two components: actual cause and proximate cause." *Clark Cnty. Sch. Dist. v. Payo*, 403 P.3d 1270, 1279 (Nev. 2017). Nevada "has long recognized that to establish proximate causation 'it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances.'" *Yamaha Motor Co., U.S.A. v. Arnoult*, 955 P.2d 661, 664 (Nev. 1998) (quotation omitted); *see also Payo*, 403 P.3d at 1279 ("Proximate cause is defined as 'any cause which in natural [foreseeable] and continuous sequence unbroken by any efficient intervening cause, produces the injury complained of and without which the result would not have occurred.'" (quotation omitted)). Causation is generally a question of fact for the jury to resolve. *See Yamaha Motor Co.*, 955 P.2d at 665 ("Proximate causation is generally an issue of fact for the jury to resolve."); *Klasch v. Walgreen Co.*, 264 P.3d 1155, 1161 (Nev. 2011) ("Breach of duty and causation are classically questions of fact.").

Sunbeam argues that Barton's negligence claim fails because "no evidence exists to establish that the heating pad was defectively designed or manufactured, or that any alleged defect in the pad caused Plaintiff's injuries." ECF No. 53 at 18.

[14] Walmart also moves for summary judgment on this ground in its motion for summary judgment. ECF No. 55 at 26–27. Because I grant Walmart summary judgment related to the contents of the warning on its joinder to Sunbeam's motion, I do not analyze whether Walmart is separately entitled to summary judgment on this ground when discussing Walmart's motion for summary judgment below.

[15] Nevada has also referred to "legal causation" as "proximate causation." *Holcomb v. Georgia Pac., LLC*, 289 P.3d 188, 196 (Nev. 2012).

Barton argues that Sunbeam knew "over 1,600 heating pad burn injuries [are] treated annually in emergency departments, . . . [and] that threshold temperatures of 116°F [are] sufficient to cause burn injuries, [which] establishes Sunbeam's breach of duty by intentionally designing and distributing heating pads that are meant to reach temperatures far in excess of these thresholds." ECF No. 60 at 27–28. Barton also argues that the manufacturing and design defects caused her injury. *Id.* at 22–23, 25–26. She relies on Murray's and Brones's reports in which both experts stated that the manufacturing and design defect caused her injury. *Id.* at 22, 25. She also relies on Sunbeam's engineering expert who stated that "if the skin temperature is held at temperatures above approximately 50°C (122°F) for 6 minutes, skin burns can occur" and that "[t]he maximum temperature requirements of UL 130 Section 27.[1] . . . are high enough that burns can occur." *Id.* at 22–23 (emphasis removed); *accord id.* at 25–26. Finally, Barton argues that her use of the heating pad as a diabetic was a foreseeable use and therefore does not qualify as "misuse." *Id.* at 27.

Sunbeam is not entitled to summary judgment on Barton's negligence claim. As outlined above, there are genuine disputes of material fact whether the subject heating pad suffered from a design or manufacturing defect, so Sunbeam's first argument thus fails. The remaining question is whether there is a genuine dispute of material fact regarding causation: the answer is yes. Sunbeam's engineering expert opined that "[e]ven heating pads that comply with the maximum temperature requirements of UL 130 Section 27.1," which is 194°F for the first heating cycle and 176°F thereafter, "can cause burn injuries when the devices are not used in compliance with their warnings and safety instructions." ECF No. 53-8 at 8–9. The expert based that conclusion on the fact that "the Standard Guide for Heated System Surface Conditions That Produce Contact Burn Injuries indicates that if the skin temperature is held at temperatures above approximately 50 °C (122 °F) for 6 minutes, skin burns can occur." ECF No. 53-8 at 9 n.2. Considering that the subject heating pad was designed to reach 132°F +/- 15 on the medium setting, ECF No. 53-4 at 92, and the "exemplar" heating pad reached 174°F "during initial

operation" and 153.5°F "during normal operation" on the medium setting, ECF No. 53-8 at 28, that evidence suggests that the subject heating pad was capable of reaching at least 122°F and therefore was capable of burning Barton if used for six minutes. Although the court recognizes that Barton used the heating pad despite having diabetes and undergoing chemotherapy, *see* ECF No. 53-2 at 16; ECF No. 53-2 at 75, and somehow burned the side of her right breast while testifying that she had placed the heating pad on her upper back, *see* ECF No. 53-2 at 24; ECF No. 53-2 at 28, these circumstances do not entitle Sunbeam to summary judgment as a matter of law. Instead, the question of causation is a question of fact that must go to the jury. *Yamaha Motor Co.*, 955 P.2d at 665; *Klasch*, 264 P.3d at 1161.

#### 3. *Punitive Damages*

NRS 42.005 provides for punitive damages "in an action for the breach of an obligation not arising from contract" "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud[,] or malice, express or implied." Nev. Rev. Stat. § 42.005(1). "'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship with conscious disregard of the rights of the person." *Id.* at § 42.001(4). "'Fraud' means an intentional misrepresentation, deception or concealment of a material fact known to the person with the intent to deprive another person of his or her rights or property or to otherwise injure another person." *Id.* at § 42.001(2). "'Malice, express or implied' means conduct which is intended to injure a person or despicable conduct which is engaged in with a conscious disregard of the rights or safety of others." *Id.* at § 42.001(3). "Conscious disregard" within those definitions "means the knowledge of the probable harmful consequences of a wrongful act and a willful and deliberate failure to act to avoid those consequences." *Id.* at § 42.001(1).

Punitive damages are designed "to punish and deter oppressive, fraudulent or malicious conduct." *Siggelkow v. Phoenix Ins. Co.*, 846 P.2d 303, 304 (Nev. 1993). To effectuate this goal, "it is incumbent upon the party whose conduct was so outrageous as to merit punishment by means of punitive damages to bear the burden of paying the award." *New Hampshire Ins. Co. v. Gruhn*, 670

P.2d 941, 943 (Nev. 1983). To determine if punitive damages are warranted, the court must determine "whether, as a matter of law, the plaintiff has offered sufficient evidence . . . to support a punitive damages instruction." *Hester v. Vision Airlines, Inc.*, 687 F.3d 1162, 1172 (9th Cir. 2012); *see also Bongiovi v. Sullivan*, 138 P.3d 433, 450–51 (Nev. 2006) (explaining that "[a] plaintiff is not automatically entitled to punitive damages" and instead must first make a showing that the defendant is guilty of oppression, fraud, or malice by clear and convincing evidence).

Sunbeam argues that there is no evidence to support Barton's request for punitive damages. ECF No. 53 at 18–20. According to Sunbeam, the evidence shows that when used properly, the heating pad does not produce burns. *Id.* at 19. Even more, Sunbeam contends that the heating pad was "designed and manufactured, and that it operated, in accordance with the long-established and widely accepted UL 130 standards." *Id.* And Sunbeam adds that the heating pad "was accompanied by thorough and adequate instructions and warnings," and "[h]ad Plaintiff read and followed those instructions and warnings, this incident would not have occurred." *Id.* Finally, relying on the deposition testimony of its corporate representative, Sunbeam asserts that no single temperature provides therapeutic relief for all, which is why the heating pad was designed to reach different temperatures, and that the agencies governing heating pads have not taken issue with the temperatures the heating pad was designed to reach. *Id.* at 19–20. Rather, those agencies are satisfied that the risk of burn can be reduced if heating pads are used in conformity with the warnings accompanying each pad. *Id.* at 20.

Barton argues that she is entitled to punitive damages because Sunbeam acted maliciously and oppressively when it knew (1) 104°F provides therapeutic relief; (2) 1,600 people per year are treated in emergency rooms for heating pad burns; and (3) 116°F can cause burns and Sunbeam nevertheless made heating pads that can reach temperatures in excess of "safe thresholds" for the sake of profits. ECF No. 60 at 28. Barton also appears to argue that Sunbeam concealed that knowledge from consumers by asserting that the heat required for therapeutic relief varies by person. *Id.*

Sunbeam is entitled to summary judgment on Barton's request for punitive damages. The evidence shows Sunbeam provided consumers with warnings intended to *prevent* burns. ECF No. 53-8 at 34–35. Barton, on the other hand, fails to produce clear and convincing evidence that Sunbeam is "guilty of oppression, fraud[,] or malice, express or implied." Nev. Rev. Stat. § 42.005(1). While she points to evidence suggesting that Sunbeam knew its heating pads could cause burns, she fails to establish by clear and convincing evidence that Sunbeam had an intent to do wrong or willfully and deliberately failed to act to avoid harm when making its heating pads because Sunbeam provided its consumers with warnings that informed its customers that the heating pad could cause burns on any setting.

**D. Walmart's motion for summary judgment (ECF No. 55) is granted in part and denied in part.**

***1. Strict Liability***

***a. Design Defect***

Walmart argues that Barton cannot establish a genuine dispute of material fact regarding whether the heating pad had a design defect because Barton's theory of a design defect requires expert testimony, yet her experts should all be excluded. ECF No. 55 at 9–12. According to Walmart, Barton's theory is that "this heating pad (and, in turn, every other heating pad) is unreasonably dangerous because it is designed to reach temperatures that cause burn injuries within minutes, and there is no therapeutic benefit the heating pad offers that requires that amount of heat." ECF No. 55 at 12.

Barton avers that the subject heating pad suffered from a defective design because it was designed to reach unreasonably dangerous temperatures. ECF No. 66 at 18–20. In support of that argument, Barton relies on her expert reports discussing how burns can occur at temperatures lower than those the subject heating pad was designed to reach and that peer-reviewed literatures establishes that patients experience therapeutic relief at temperatures in the range of 104°F. ECF No. 66 at 18–19. She also points to the report of Sunbeam's engineering

expert in which he stated that "if the skin temperature is held at temperatures above approximately 50°C (122°F) for 6 minutes, skin burns can occur" and that "[t]he maximum temperature requirements of UL 130 Section 27.[1] (below 194°F for the first cycle and 176°F thereafter) are high enough that burns can occur." ECF No. 66 at 19 (emphasis removed); *see* ECF No. 66-17 at 9 & n.2 (the report).

Walmart fails to meet its burden showing there is no genuine dispute of material fact over whether the heating pad had a design defect. Like Sunbeam, Walmart attaches Sunbeam's engineering expert's report, which includes the 1995 public health advisory, establishing that the subject heating pad was designed to get hot enough to burn flesh. ECF No. 55-22. Additionally, Walmart attaches the warnings accompanying the heating pad, which warn that the pad could cause burns on any setting. ECF Nos. 55-4, 55-5; *see* ECF No. 55-22 at 34–35. Finally, Walmart attaches summaries of the Sunbeam studies establishing that applying lower levels of heat provided therapeutic relief from certain kinds of pain. ECF No. 55-33. That creates a genuine dispute of material fact whether the subject heating pad was defective because it was designed to reach temperatures hot enough to burn Barton, or whether it was properly designed to, and also if it could have provided therapeutic relief at a lower temperature.[16]

---

[16] Even assuming the burden switched to Barton, she creates a genuine dispute of material fact for similar reasoning. Barton cites Sunbeam's engineering expert's report discussing that the subject heating pad could get hot enough to burn Barton and the 1995 public health advisory stating that burns can occur using heating pads on the low setting. ECF No. 66-17 at 9 & n.2, 48. That is enough to establish a genuine dispute of material fact whether the heating pad suffered a design defect when it was designed to get as hot as it did. And it is not fatal that Barton failed to produce evidence that heating pads could provide relief at a lower temperature (i.e., 104°F) because "proof of an alternative design is not required." *Ford Motor Co.*, 402 P.3d at 655. Walmart is therefore not entitled to summary judgment on Barton's strict-liability claim arising from a design defect.

### *b. Manufacturing Defect*

Walmart argues that Barton's engineering expert's conclusions are flawed because he did not consider how hot the pad would feel to a user under real-world circumstances, he tested the pad on high rather than medium, and he did not consider the fold in the subject heating pad. ECF No. 55 at 24. Related to that last point, Walmart argues that there is no evidence that the fold existed at the time the pad left Walmart's control. *Id.*

Barton argues that testing revealed that the heating pad reached temperatures higher than it was designed to reach and higher than the UL 130 standard. ECF No. 66 at 22–23.

Walmart fails to meet its burden showing summary judgment is warranted on the manufacturing defect claim. Walmart cites the report of Sunbeam's engineering expert, ECF No. 55-22, which, as already explained, found that the subject heating pad used by Barton and the "exemplar" pad reached temperatures above what they were designed to reach. And Walmart cites Murray's test of the heating pad that did not state the temperature spikes he measured occurred at the fold.[17] ECF No. 55-17 at 6–8. There is therefore a genuine dispute of material fact whether the subject heating pad overheated due to a fold caused by alleged misuse or whether it overheated due to a potential design or manufacturing defect. Accordingly, Walmart is not entitled to summary judgment on Barton's strict-liability claim based on a manufacturing defect.

### *c. Failure to Warn*

Walmart argues that Barton cannot establish that a different warning would have altered the way she used the product when the heating pad was placed on her back as she lied on her stomach and thus Barton could not see the warnings to heed them. ECF No. 55 at 26–27. Barton does not address Walmart's argument. ECF No. 66 at 23–24. Instead, she argues that the heating pad should have included warnings on the pad itself rather than on a tag attached to the pad's electrical cord. *Id.*

[17] Barton likewise attaches both engineering expert's reports to her opposition and therefore would have created a genuine dispute of material fact had the burden switched to her. ECF Nos. 66-6, 66-17.

Barton fails to meet her burden. The burden switched to Barton when Walmart attached Barton's own deposition testimony stating that she could not see the pad when she was using it. ECF No. 55-2 at 9–10. And while Barton again provides Kitzes's rebuttal report, ECF No. 66-16, and her deposition testimony in which she stated she was not sure whether she would have read or followed the instructions accompanying her daughter's heating pad had she seen them, ECF No. 66-5 at 8–9, Barton failed to cite her daughter's deposition testimony stating that she would have called her mother's doctor before using the pad had she seen the warning. *See* ECF No. 66-3. Walmart is therefore entitled to summary judgment on Barton's strict liability claim arising from a failure to warn associated with whether the warning was designed to reasonably catch the consumer's attention.

### *2. Negligence*

Walmart argues that Barton cannot establish there was a defect nor has she "produced any evidence suggesting that Walmart should have known of the defect and acted unreasonably in selling the heating pad." ECF No. 55 at 28. To support its lack of evidence argument, Walmart attaches the deposition of its corporate representative, ECF No. 55-10, who testified that Walmart is "reliant on the expertise of [its] suppliers," "have set forth a requirement that product be evaluated by an independent third party to ensure that it meets all regulatory requirements as well as industry safety standards," and the model of heating pad at issue here was "evaluated to ensure that it met UL Safety Standard 130." ECF No. 55-10 at 26, ll. 9–15; *see* ECF No. 55-10 at 29, ll. 7–13; ECF No. 55-10 at 43, ll. 9–21; ECF No. 55-10 at 44, ll. 12–25. The representative also testified that, as far as Walmart knew, that model of heating pad passed that testing in 2020 and 2021 and only failed in 2022 and 2023 for reasons unrelated to the issues here. ECF No. 55-10 at 51–56. Finally, the representative testified that, aside from Barton, Walmart is unaware of any customers reporting burn injuries from the model of heating pad at issue in this action. ECF No. 55-10 at 37, ll. 16–22.

Barton does not address those arguments and instead repeats her argument that Sunbeam—not Walmart—was negligent. ECF No. 66 at 24. In its reply, Walmart argues that Barton's failure to address Walmart's actions means that she has "confirmed she has no evidentiary basis to support . . . a negligence claim" against it. ECF No. 73 at 10.

I agree with Walmart: there is no genuine dispute of material fact; indeed, Barton passively agrees as she avers only Sunbeam was negligent. So Walmart is entitled to summary judgment on Barton's negligence claim against it.

### *3. Punitive Damages*

Walmart argues that Barton has no evidence, let alone clear and convincing evidence, that Walmart acted with malice, oppression, or fraud in selling the subject heating pad. ECF No. 55 at 29. Without relying on any evidence, Barton asserts, in total, that "Walmart has chosen profits over safety by closing its eyes and intentionally choosing profits over consumer safety." ECF No. 66 at 25. And the remainder of her arguments relate to Sunbeam's—*not* Walmart's—actions. *Id.* Barton therefore fails to provide clear and convincing evidence that Walmart has been guilty of oppression, fraud, or malice, so Walmart is therefore entitled to summary judgment on Barton's prayer for punitive damages.

## IV. Conclusion

IT IS HEREBY ORDERED that plaintiff Marlena Barton's motion for summary judgment **[ECF No. 52] is denied**.

IT IS FURTHER ORDERED that defendants Sunbeam Products, Inc.'s, Newell Brands, Inc.'s, and Newell Brands Distribution LLC's motion for summary judgment **[ECF No. 53], to which defendant Walmart Inc. joined in part [ECF No. 54], is granted in part and denied in part**.

IT IS FURTHER ORDERED that defendant Walmart Inc.'s motion for summary judgment **[ECF No. 55] is granted in part and denied in part**.

IT IS FURTHER ORDERED that this case is referred to the magistrate judge for a mandatory settlement conference regarding Barton's live claims against the defendants (i.e., strict liability arising from a design and manufacturing defect as to both defendants, strict liability arising from a failure to warn as to Sunbeam, and negligence as to Sunbeam).

Dated: October 9, 2026

Cristina D. Silva
United States District Judge